MISSISSIPPI CENTRAL RAILROAD COMPANY *v.* THE STATE
OF MISSISSIPPI.

1. CHARACTER OF THE GOVERNMENT OF MISSISSIPPI DURING THE WAR AFTER SECESSION.— During the late war between the United States and the Confederate States, the government of Mississippi, which followed the ordinance of secession, was insurrectionary and revolutionary in its character.

2. SAME — THE NEW GOVERNMENT DIFFERENT FROM THE OLD — CASE IN JUDGMENT. — The government of the state of Mississippi of the United States was not the government of the state of Mississippi of the Confederate States, the government of the former having been overthrown and destroyed by the establishment of the latter. Hence, money due to the former was not legally paid to the latter, and such payment did not discharge a debt due to the former.

3. AUTHORITY CITED — TEXAS V. WHITE ET AL., 7 WALLACE, 700. — The case of Texas v. White et al., 7 Wall. 700, cited and declared applicable to the facts of this case, which is pronounced to be stronger in its facts than that case.

4. STATUTE IN AID OF REBEL LION.— The act of the legislature of Mississippi "to enable the railroad companies of this state to pay the moneys borrowed by them," approved December 7, 1863, was in aid of the rebellion, by supplying an exhausted treasury with the means of prosecuting the war then being waged for the avowed purpose of subverting the government of the United States.

5. NO AUTHORITY TO RECEIVE PAYMENT. — The state treasurer had no authority to receive either Confederate or state treasury notes from the railroads in payment of the money borrowed by them before secession.

6. WHAT LAWS PASSED DURING THE WAR VOID. — All laws enacted by the several states at war with the United States, in aid of it, to further its prosecution, are void and of no effect.

7. TEST OF VALIDITY. — The test of validity or invalidity is the intention of a law, its purpose and effect.

8. INTENTION — HOW ASCERTAINED. — An approved mode of ascertaining the intention and purpose of a law is to look at the state of affairs at the time of its enactment, and the effects that will be produced by it.

APPEAL from the chancery court of Madison county. YOUNG, Chancellor.

The facts of the case will be found in the opinion of the court, as far as is necessary to fully understand the view of the court.

A detailed history of the Chickasaw school fund is contained in the brief of *W. P. Harris ;* and a narrative of the ordinance of secession, and auxiliary ordinances of the convention of 1861, and the succeeding legislation of the state, during the war, relating to the matters under consideration,

will be found in the brief of *J. A. P. Campbell*, which the reporter adopts.

This case was argued orally, by *William Yerger* and *W. P. Harris*, for appellant, and by *J. A. P. Campbell* and *C. C. Shackleford*, for appellee.

No memorandum of the argument of *Mr. Yerger* has come to the hands of the reporter.

*W. P. Harris*, for appellant.

The act of congress of 1836, Code (Miss.), 682, in regard to the Chickasaw cession, reserved an amount of land equal to one-thirty-sixth part of that cession, for the use of schools in the state of Mississippi, vesting the title to the land in the state of Mississippi on the terms and conditions by which the state held the reservation of sixteen sections under prior acts of congress. By the act of 1842, Code, 685, 686, the governor was authorized to locate the lands so reserved, and this being done, the act of 1848, Hutch. Code, 233, provided for the leasing of the lands located, for ninety-nine years, for cash, and directed that the money arising from the sales of leases should be paid into the treasury of the state ; that an account be kept against the state of the moneys so received, and that the same should be a charge upon the state, "in trust for schools, and to be applied to that purpose, as might be thereafter directed by law." This is the origin of what is called the "Chickasaw school fund." This special direction of the money arising from the sales of the land was changed by the act of 1856. *Acts* 1856, p. 141. By that act the auditor was directed to credit the "Chickasaw school fund's account," ordered to be kept by the act of 1848 against the state, with interest at eight per cent per annum, which interest was to be payable, semi-annually, out of the treasury to the counties entitled to the same ; and that the principal sum then in the treasury, or which might thereafter come into the treasury, should become a charge on the state and remain subject to "general

appropriation by law from the treasury, or otherwise to be used by the state in the same manner as money received by the state from other sources of revenue." By the fourteenth section of the act, p. 145, a sum equal to the amount of the money arising from the Chickasaw school lands was appropriated as a loan to certain railroad companies, to be paid "out of any money in the treasury not otherwise appropriated," in equal amounts, to the companies' roads named, of which the appellant is one. The loan was for seven years from the date of the warrant of the auditor, and to bear eight per cent interest, payable semi-annually. To secure the payment of these loans, the auditor was to receive from the borrowers first mortgage bonds on all the property of the companies, equal in amount to the sum loaned, the obligations of the companies to repay the loan to the state, with the interest, at the end of seven years and certificates of stock in said companies for four times the amount of the loan, all payable to the state, and to be deposited in the treasury.

In case of default in the payment of interest, the whole amount of principal and interest was to become due, and on non-payment for sixty days, the treasurer was authorized to enforce by suit or to sell the stocks and securities deposited with him, at public sale for cash ; and the legislature reserved the right to require additional security, from time to time, if depreciation in the value of the securities deposited should render it necessary. By the twenty-second section, p. 148, the privilege of loan was to be forfeited if not applied for within sixty days after the passage of the act, which took effect on the 7th day of March, 1856. The loans began to mature in the winter and spring of 1863-4. They were not all received at the same date, being paid out by the state according to the condition of the treasury, and, consequently, did not all fall due at the same time ; but the bulk of the principal matured in 1863, and about half the principal was paid by two of the companies in that year, and before the passage of the act of 1863. It became necessary to legis-

late on the subject. The state was called on to decide whether the scheme of 1856 should be continued. Accordingly the act of December 7, 1863, was passed, continuing the obligation of the state to pay eight per cent interest to the counties on the fund, and placing the amounts of principal paid or to be paid by the roads in the treasury, subject to general appropriation as by the act of 1856. The payment by the companies of the balance due, to be in specie or in state treasury notes, provided payment was made by the first of May thereafter. The act is clumsily framed, but its meaning is as just stated. Under this act what remained of the debt was paid and the security surrendered. The Johnson convention of 1865 expressly declined to ratify, by designation, the said act of 1865. See Const. and Ordinances, pp. 38, 39, 40 and 41, in the general ratifying ordinance, declaring in the ninth section, p. 41, that the intention was not to validate or invalidate the acts of any officer receiving payment from the railroad companies, but to leave the same for adjudication to the courts. In the enumeration of acts of the legislature not to be enforced henceforth, the convention designated acts providing for the payment of public dues to the state in Confederate money. The legislature, assembled after this convention, took up the subject of the " Chickasaw school fund." A committee of the house was directed to report on the condition of the fund. The committee reported as the result of the legislation of 1856 and 1863, that the state is the debtor to the fund, and remains liable to pay it, leaving the question between the state and the railroads open, the committee expressing no opinion and suggesting that no legislation could change the attitude of the parties, and expressing the same view as to the action of the convention of 1865, suggesting that the convention designed to leave the question where it stood, to be settled by the courts, and reported a bill to authorize suit by the state. House Journal, 1865, pp. 30, 31, 32. This led to the act of 1865, Acts, p. 147, which, after reciting that the state of Mississippi had loaned large sums of money to the

railroad companies, and that the state had lost the obligations and securities for the same without just compensation, empowers the governor to demand new obligations and securities of said companies, with an extension of the time of payment, and on refusal of the companies to comply, the attorney-general was directed to institute suit against the companies. No steps were taken under this act until Gen. Ames was appointed to the command of this military district. Under his direction Capt. Myers, acting attorney-general, filed the bill in this cause, in obedience to the act of 1865.

The bill, of course, rests on public acts and history, and insists that the payment of the debts by the said companies was illegal or ineffectual. 1st. Because the government receiving payment was not the rightful government of Mississippi, being an insurrectionary government. 2d. Because said insurrectionary government was at war with the United States, and said payments made without compulsion, and "the natural consequence of such payments * * * was to furnish aid and encouragement to the enemies of the United States in carrying on war against them." 3d. Because the payments were made in the war currency, and for that reason invalid. 4th. Because the act of 1863 was of no binding authority. 5th. That the payments were in a depreciated currency, and can in no event be good beyond the actual value of such currency at the time.

The bill seeks to recover the amount due and unpaid at and from the date of secession, holding all subsequent payments to be void; also, the re-delivery of the mortgages and stock certificates, and an account of the value of the currency paid.

The exhibits to this bill show the date of the loan warrants to the appellant, up to May 7, 1856, $95,000, and up to 26th January, 1857, $162,000, and small sums afterward, making the entire amount borrowed $199,000; that the company paid the interest from 1856 to September, 1864, paying each and every year, and of the principal

February 18, 1863, $45,000, August 19, 1863, $50,000, December 30, 1863, $37,000, January 18, 1864, $40,000, September, 1864, $26,150, being total of principal.   It be will seen that, prior to the act of December 7, 1863, the larger part of the principal of the debt had matured, and $95,000 had been paid.

There is a demurrer to the bill, by which the propositions above stated, being exclusively propositions of law based on public acts and public history, are controverted.

The roads were not the holders of trust funds, nor the debtors to trust funds, but debtors to the state.   The case then is not embarrassed by any question of trust, nor is it varied by the fact, that the debt of the railroads arose out of the plan adopted by the state for administering the Chickasaw school fund, the prominent feature of which was to convert the fund to the use of the state, and to put the loan on the footing of a loan by the state of her own money.

The debt, therefore, stood on the footing of all other debts due to the state at the date of secession — of all pecuniary demands whether founded on loans, taxes already assessed, dividends on stocks owned by the state, or due to the sinking fund.   If it was unlawful to pay one of these, or if the payment was ineffectual for want of legal authority in the government for the time to receive it, then the payment of any demand to the state, due before secession, was ineffectual, and we are thus brought face to face with the question, whether the payment of a debt due the state of Mississippi, to the government, during the war, was valid.

The comprehensive spirit of the declaratory provision of the constitution of 1868, announcing, indeed, as the result of adjudications by the highest court of this state, and the supreme court of the United States, has relieved the country of a discussion, not only profitless, but injurious, as merely fostering hobbies and creeds.   It may be affirmed as the practical principle for the guidance of courts and legislatures, that the validity of any act done or permitted by the government of Mississippi, after the ordinance of secession, depends

upon the character of the act, and not upon the character of the government or the legitimacy of the authority it exercised. It has been declared on the one hand to have been a government *de jure*, and on the other hand that it was neither a government *de jure* nor *de facto*. The guiding rule by which we get out of the confusion of creeds, is, that it matters not whether it was one or the other. If the act was within the ordinary constitutional limits, and not done "in furtherance of secession and rebellion," it cannot be impeached. The government of the United States regarding the state governments, after secession, as being administered on the basis of governments separate from and independent of the federal union, and forcibly maintained in hostility to the United States, declared them to be "unlawful," and the supreme court of the United States, in Texas *v.* White, 7 Wallace, declared that these governments must be so held "in the courts of the United States." They were unlawful in a sense which affected their constitutional relations to the United States, and in their attitude of resistance to the national government. But this character ascribed to them from a political necessity which required them to be displaced to the end that the "broken relations" to the United States might be restored through loyal governments to be instituted, has been decided by the highest judicial authority to be compatible with the validity and binding force of the acts of these governments within certain limits. In other words, the relations between the state government and the people of the state were not broken. The government of Mississippi, as to the people of Mississippi, and their domestic concerns and duties, was efficacious, capable of performing acts valid as to them, if within the limits of the constitution of the United States, and such as a "rightful state government might perform." The government was of that character, call it by what name you please, that during its existence, except in the sphere of federal power and relations, "its acts were effectual, and in almost all respects

valid." In Texas v. White, speaking of the government of Texas, the chief justice remarks :

"It is an historical fact, that the government of Texas, then in full control of the state, was its only actual government ; and certainly if Texas had been a separate state, and not one of the United States, the new government, having displaced the regular authority, and having established itself in the customary seats of power, and in the exercise of the ordinary functions of administration, would have constituted, in the strictest sense of the word, a *de facto* government, and its acts during its existence would be effectual, and in almost all respects valid. And to some extent this is true of the actual government of Texas, though unlawful and revolutionary as to the United States."

This measured and well-weighed language is followed by suggestions as to the "extent" to which the acts might be considered valid. The court gives a "general test," which carries validity to all the acts which a rightful state government might do, and which are not done in furtherance of rebellion "against the United States, nor to defeat the just rights of citizens," by which we are to understand, constitutional rights, political or personal.

These limits are fixed with greater precision by the present state constitution, in art. 13, §§ 1 and 2, which, without attempting to state the character of either of the two doubtful governments which prevailed subsequent to secession, declares certain acts void, and affirms the validity of the remainder. These acts are "The Ordinance of Secession," and acts "in furtherance of secession and rebellion," and acts inconsistent with the constitution of the United States and the present state constitution. In making certain exceptions to this sweeping affirmation, the convention excepts a class of acts which had accomplished their object, and thus showing that they were announcing a principle which embraced acts which were executed by their passage. This is the spirit of the constitution toward the past, "and the spirit of a constitution is entitled to a higher degree of

respect than that of a law being the paramount law couched in general terms." See the forcible language of Sharkey, C. J., 7 How. 17.

These declaratory provisions, usual on the adoption of a new constitution, do not unsettle vested rights, but they are understood always to declare "a great principle, which is to control all legislation, and extend through the whole body politic," and to manifest the spirit and policy of the constitution, to cure where it can cure and to quiet doubts. The constitution of 1817 affirmed the territorial laws, contracts and marriages; that of 1833 affirmed the previous laws in almost the precise words used by the convention of 1868, and plainly the language of the schedule was taken from the schedule of 1833, excepting the words "in furtherance of secession or rebellion." These bodies had the power to repeal a law or to confirm and continue it. The courts do not rest the validity of the legislation on these declarations alone, although they are properly appealed to as indicating the spirit of the fundamental law, and as evidence that the laws have not been annulled. It is here introduced to show that a convention dealing with laws having their origin in the legislation during the war, and in the legislation since the war, emanating from governments declared illegal and illegitimate by the United States, put them on the same footing, and both on the footing of the laws of all previous governments in this state; that is to say, they are affirmed, provided they do not conflict with the constitution of the state and the laws and constitution of the United States, for secession and rebellion against the United States are clearly understood to be comprehended in this prohibition.

It is to be observed that the supreme court of the United States, in defining the character of state governments after secession, declared them to be revolutionary only as to the United States. Historically, and as indubitable matter of fact, this is true. That court further declared in substance that they were *de facto* governments in the strictest sense,

except in those particulars in which their acts affected the federal relations, and bore upon federal powers and prohibitions, as to which the courts of the United States held them to be ineffectual and invalid. This is the character given to the state government in a long series of cases decided by the high courts of errors and appeals, and the supreme court of this state and of the United States. Texas v. White, 7 Wall. ; Thorington v. Smith, 8 ib. ; Green v. Sizer, 40 Miss. ; Miller v. Palmer, and other cases not published.

It is part of the judicial history of the state, that the legislation during the war, making permanent changes in the municipal laws of the state, and embracing in its range a great many subjects of ordinary legislation, have been dealt with as acts of the " Legislature of the state of Mississippi," by judges of every shade of political opinion, and under all the conditions of the local government since 1861, and this recognition, so creditable to the conservative character of the courts, has been solemnly confirmed by the convention of 1868.

The result is, that while in the courts of the United States and of this state, the government is held to have been insurrectionary and revolutionary as to the United States, it is considered as having exercised effectual and valid authority over the domestic concerns of the state as a *de facto* government, to that extent, in the "strictest sense ;" not to every extent, for the plain reason that the government of the United States denies to the states the power to modify their relations to the United States, though they may for a time interrupt them. The insurrectionary government of a state could, at most, attain to valid power over strictly state concerns, the dimensions, so to speak, of the rightful state government — and could never effectually sever the relations to the United States, nor effectually exercise the powers surrendered to the United States in the constitution.

The government of the United States claimed the rights

of a sovereign throughout the war, and maintained them finally, though their exercise was temporarily obstructed, and it is legally impossible, on their claim, to acknowledge as valid any act impeaching that claim, or that, as to the United States, there was a *de facto* government capable of making any law "effectual" which infringed the title of the United States, or encroached on federal powers and prohibitions.

The position of the state government to the people of the state was very different. Its relations to the people of the state, in regard to all the legitimate functions of purely state government, were never changed nor attempted to be changed. Adverting to the historical fact, there never was an insurrection of any portion of the people of the state against the government of the state, no lawyer of any repute will venture the opinion that those who obeyed the state government during the war, or served it in any capacity, committed treason against the state ; and this peculiar condition of things, growing out of the compound character of our political system, compelled the judiciary and the political department of the state government to invest this government, during the war, with the character of the representative government of the state as to its domestic concerns, and by binding authority, regulating them, and consequently of imparting to the acts of the government in this respect something more than the authority of a *de facto* government.

The declaratory act of the convention of 1868, designed to dispel all doubts on this subject and to fix the character of the legislation during the war, a subject which had given rise to much doubt and embarrassment, places the acts of the secession legislature, except those in aid of the rebellion, on the same footing of the acts of all the legislatures which have ever assembled in Mississippi.

There can be no question about the authority of the government during the war, to do any act or pass any law relating to its own domestic affairs, or its power to repre-

sent the state as to its own local concerns, so far as it assumed to do so. The question as to whether it was a legal state government, or the government of Mississippi for the purpose of doing every thing which a rightful government could do, is put to rest by a few plain words of the convention of 1868, which abrogated all acts contrary to the constitution of the United States, and recognized the validity of those acts not obnoxious to this objection. Thus furnishing the true practical "test" by which the past is to be tried, and the application of any other test by the courts would lead to endless difficulties and perpetuate the state of doubt and uncertainty from which the convention aimed to rescue us. If the legislature was without authority, what is it that upholds the acts of the judicial department?

It is a fact not without its weight, and containing within it an admonition not to be disregarded, that the supreme court of the United States, the high court errors and appeals, and supreme court of this state, each in its turn, in considering the question of the validity of the acts of the nondescript state governments of the rebellion, have, without a single exception, in all the numerous cases arising, after debate and speculation as to the character of these governments, under a sense of the insuperable difficulties attending the application of any rule founded on the nature of those governments, resorted to the test adopted by the convention of 1868, and placed the decision on the character of the act and not upon the character of the government. Texas v. White, 7 Wall. ; Thomas v. Taylor, 42 Miss.

If we assume that the government was a government *de jure*, we encounter the difficulty of its revolutionary character toward the government of the United States. If we proceed on the assumption that it was illegal, and therefore not the government of the state for any purpose, we encounter a difficulty quite as great. It is impossible to deny that a state government alone can regulate the internal concerns of a state, or to conceive of a condition on which

the people of a state may lose their capacity or right of self-government, or, in the language of the supreme court of the United States, their separate "autonomy," the right and power to institute, under any condition, except that of strict and complete conquest (a thing impossible by the government of the United States), government of some kind, which, as to them and their own peculiar concerns, is effectual and authoritative, and therefore essentially valid. The historical fact warrants the assertion, that there was no design to displace one state government by another; and the theory on which secession proceeded was, that no displacement or change of internal structure of the existing state government was necessary, nor any change of functionaries. One of the fatal attractions of secession was, that it involved no derangement of the state government. Displacement may be a necessary legal fiction, but, as applicable to the historical facts, a pure fiction. The government, whether in contemplation of law a new government or not, did not supersede the old government, and the logical deduction from these facts carries us inevitably to the conclusion, that it was a lawful state government as to the people of the state, having their consent and obedience, but a lawful government attempting to do an unlawful act, unlawful in its action, but in its proper sphere lawful. It is an instance, as regards the state and its internal affairs, of an insurrection, in which no state law was overthrown or resisted, and no opposing state authority, nor any other representative or pretender. These difficulties lie in the path of those who undertake, by logical process, to solve the question by assuming that there was no government, because no legal government, and the futility of the attempt has been exemplified in a striking manner, by ingenuous arguments, addressed from time to time to the high court of errors and appeals, which begin with a proposition that, without recognition by the government of the United States, there could be no legal state government, and especially no legal state government, when Congress declared there

was none, and consequently there was no law in force in this state since 1861, no marriages, no contracts, no courts.

We have lived under a government held to be illegal and incapable of restoring the relations of the state to the federal union, and yet efficacious to regulate the domestic concerns of the state, and we witness in the case of Georgia an instance of a constitution ratified by Congress, and a state not considered in full constitutional relations to the United States, for want of complete recognition, and yet with a government efficacious in regulating state concerns. It is plain we cannot carry out in logical sequence the infirmity in the source and structure of these governments into their acts. The statesmanship which deals with these conditions cannot be guided by legal axioms nor shaped by the rules of logic. The judicial as well as the political department must recognize a principle founded in the just claims of human society, as to things done in the past.

There is therefore to be found in the judgments of courts, sufficiently removed in time from the conflict in which opposing opinions were greatly intensified, a tendency to narrow the field of controversy and to shut the door of inquiry upon every act not necessary to be annulled, in order to vindicate the principle of the indestructibility of the federal union and to negative the lawfulness of secession, and this spirit animated the convention of 1868.

It is not to be disguised that many of the utterances of judges, in other states, and perhaps in an occasional but rare instance in this state, have seemed to proceed from a conviction of the necessity of settling every question growing out of secession judicially, in order to complete the triumph of certain doctrines ; and that, in order to heighten the crime of secession, it was necessary to visit every act which followed it with the penalty of nullity ; and it may be said, also, that extreme opinions in one direction have provoked extreme opinions in a contrary direction. Nothing, however, is clearer than the truth, that the line of wisdom, safety and justice run between the extremes.

We cannot abandon the adopted test, that whatever can be reconciled to the constitution and laws of the United States, and the constitution of the state, and all acts not done "in furtherance of secession and rebellion," shall stand, without getting into a sea of trouble and uncertainty and starting controversies which will be decided according to the temper or caprice of the judges.   If we now concede that the want of legitimate authority, a legal infirmity in the government itself, is a ground on which a law or public act may be declared void, then judges may cull from the mass of legislation any unpalatable measure and declare it void, on the ground that the authority which put it in force was not the legal government of Mississippi.

There never was a more opportune or a more suggestive observation than that of Chief Justice Chase, that though the legislatures of the seceded states were unlawful bodies in the view of the courts of the United States, their acts, to a certain extent, were "effectual and valid."

So far, therefore, as the bill in this case rests on the proposition that the payment to the existing government, for the time being, was ineffectual, on the assumption that that government was not a legal government, it falls short of presenting the true test of validity.   As the only actual government, and a government complete and absolute in all its appointments, governing not by actual force alone, but according to the established forms of settled, peaceful governmental action, through the instrumentality of laws passed by the representatives of the people, and enforced b y ordinary civil and criminal procedure in judicial courts for over four years, it had that character which made it the representative of the state to its own citizens, and as to all subjects of local concern, and this rendered the payment to it valid and effectual.   As the point is made in the bill, we propose to consider how far payment to the actual though illegitimate government stands on the authority of courts and jurists independent of the confirmation by the incoming rightful government.

It was, as we have seen, a debt due to the state, one of the public dues, differing in no respect from any other. The taxes which had been assessed since 1860 were public dues and were paid to the secession government. The debt of the railroads, and the debt for taxes, were created by laws passed prior to the war, and which had no reference to it. When paid into the treasury by the debtors, they alike became subject to any disposition which the state chose to make of the money. The state had the same unrestricted power over both, and payment to the treasury in either case was effected by the consideration that it enabled the government to employ the money in support of the war, or to defray the ordinary expenses of the government, to pay the interest on the Chickasaw school debt, to which they were doubtless in part applied. In both cases the law gave the state extraordinary power to enforce payment without a resort to a suit in court. The power of seizure and sale by distress, for the taxes, being in nowise more stringent or efficacious than that which the law of 1856 provided for enforcing the debt incurred under that act. Default in the payment of principal or interest gave the state the power to inflict ruin on the company. The power to enforce the law existed in all its amplitude, and irresistible as the power of government fully supported by an undivided public opinion ever was. The existing government recognized the laws passed before secession, and enforced them. Indeed, it maintained that it was the regular and orderly constitutional government which had existed from the birth of the state, with its political continuity unbroken, and its internal structure unchanged. The payment of taxes and other public dues, under laws passed before secession, and which had never ceased to operate, to the government, practically continuing with unquestioned power and authority was, according to the established usage of the civilized world, and the settled doctrines of modern public law, valid and efficacious. It could not be held invalid by the test we have heretofore discussed, even though the debtor may have had

reason to believe that all or part of the money might be illegally applied. His debt was due by a law untainted by any kind of infirmity, and payment could not be evaded. No principle touching the effect of illegal purpose in an act or contract was ever carried to the extent of excusing a debtor, for non-payment, on the ground that he had reason to believe the money, if paid to the creditor, would be employed in bribery or gaming. The law being unquestionably valid, obedience to it, where resistance was impossible, involved no criminal purpose in the debtor. We cannot, therefore, impute to the debtor, under these circumstances, a purpose to aid the rebellion. In point of fact, it may be that the constituents of the company were hostile to secession and loyal to the United States. It is the purpose, however, at this stage of the argument, to consider the payment as assailed, on the sole ground that it was made to a government having no right to receive it.

The established doctrine is, that a government claiming to represent the state, and with complete power to enforce that claim, whether that be founded on conquest or usurpation, or displacement by other cause, does represent the state while it exists, and is in possession of all the seats of power, controlling completely the civil and military administration, and that payment, under a law which it "recognized or imposed," of a debt due the state, is efficacious. This is the rule in the law of nations, and is recognized by the courts. The principle on which it rests is stated in Rice v. The United States, 4 Wheat. 246, in these words : "By the conquest and military occupation of Castine, the enemy acquired that firm possession which enabled him to exercise the fullest rights of sovereignty over that place. The sovereignty of the United States over the territory was suspended, and could no longer be enforced there, or be obligatory on the inhabitants who remained and submitted to the conqueror. By the surrender the inhabitants passed under a temporary allegiance to the British government, and were bound by such laws, and such only, as it chose

to recognize and impose. From the nature of the case no other laws could be obligatory upon them; for, where there is no protection, allegiance, or sovereignty, there can be no claim to obedience. * * * The resumption of authority could not change the character of the previous transactions.''

By bringing merchandise into the United States, a debt is incurred for the duty to the United States. This debt, in the case referred to, having been paid or 'released by the actual temporary government, left the party under no obligation to pay the rightful government on the resumption of its authority. The collection of debts due the rightful government, by an usurping government or power which completely displaces, though temporarily, the regular authority, discharges the debtor when the actual government constrains the payment by law or otherwise. The rightful government being unable or unwilling to protect the debtor from the power of the actual government, the latter is for the time taken to be the government he is bound to obey.

The first Napoleon took possession of many states and countries by force of arms merely. He displaced kings and rulers of every degree, and made, in the language of the day, a new map of Europe. To simple military occupation he added civil government, with new rulers. This condition of things was maintained by the same unauthorized but irresistible power. He extorted recognition of his new governments by the same means he employed to establish them; yet the lawyers and jurists of Europe held that the alienation of public property by the ephemeral governments, and the collection of public dues by them, were binding upon the incoming rightful government, and in the case of the Prince of Hesse-Cassel, expelled in 1806, and restored in 1814, they decided that payment to the *de facto* government of debts due to him were valid, and in a case where but half the debt due had been exacted, and a discharge given to the debtor, without any application of actual force, it was held to be valid; and of course force

could not compel a party to purchase public property. The displacement of the rightful ruler lasted eight years, but time was not the influential point. The completeness of the power of the new government, for the time being, was the material consideration. Debtors ordered to pay by and paying to a power purely of force, resulting from military occupation, are discharged. When the occupation assumes the character of "complete conquest;" that is to say, where regular government is installed in every department of administration and reaches every foot of the territory, which is complete conquest, it may prove to be temporary, but assuming to be permanent, and compelling a recognition of it as having that character, actual force is not needed to justify payment if it be required by law. See Halleck, Intern. Law, 841, 842. The actual government of Mississippi possessed every essential element of the Napoleon governments, and, besides, had a certain legitimacy, which, as it induced consent, increased its vigor and authority.

It is admitted that the government of Mississippi, which collected the debt in this instance, had all the attributes of a *de facto* government, except as to certain attributes or powers, which, by consent of all the states forming the union, under the constitution, were surrendered to the United States. These powers were derived from, and extended over all, the people of the United States, and the position of the United States is, that no one state could acquire these powers by usurpation, short of complete subversion of the government rightfully claiming them, and the mere temporary obstruction to the exercise of these powers, by the forcible resistance of one or more states, was not a displacement of the government of the United States. As to the powers not surrendered, but reserved to the state, embracing the control of its domestic concerns, matters to which the powers of the central government do not extend, it is admitted, in the most deliberate and important judgment ever rendered by the supreme court of the United States, that the power and right of self-government existed

in the states, notwithstanding secession. There is admitted to be a nearer approach to the character of a perfect *de facto* government, in the case of the state governments, than in the Confederate government, and the difference is owing to the fact that the states had the original power of self-government as a right, and the rightful state government was completely and thoroughly displaced by the new government, whereas the Confederate government, in the view of the courts and government of the United States, had no elements of rightful power, and never succeeded in displacing the government, the powers of which it assumed. There resided in the people of the several states the original rightful power of self-government, but there did not reside in the collective body of the people comprising the so-called "people of the Confederate States" original rightful power to erect a central government, and invest it with powers belonging to the United States. Its creation, therefore, was an infraction of the constitution and laws of the United States. All the powers it assumed were powers belonging to a government which continued to exist, which was obstructed, but never displaced nor overthrown. Its usurpation included every power it exercised, and, consequently, the force of law is not ascribed to its acts, and it is declared to have been in the lowest scale of *de facto* authority, and the application of actual force, necessary to excuse acts done under its authority. Hence we see that it is not a justification for any act, to say that a Confederate law sanctioned it. United States v. Kuhler, 9 Wall. 83.

The United States have uniformly denied that the Confederate States ever so far acquired the character of a *de facto* government as to enact a binding law. But this position has never been taken as to the state government. In case of the states, there were existing exclusive powers, and a government, as to them independent. These powers, on the supposition that a revolution occurred in the local government, were completely usurped over the entire territory in which the rightful government existed, and over which

it exercised control.   There was no power it did not grasp, and no foot of territory over which it was not extended. On the hypothesis that a new government was erected in place of the old one, that old one was not so much displaced as annihilated or obliterated.   The process was like complete petrification in the natural world, where the old body is succeeded by something which takes its place in substance and every minute peculiarity of form.   The rightful state government cannot affirm that it was not thoroughly overthrown.   After all, the ground on which payment by debtors to an usurping government is rather the extent of the power, than the character of the usurping authority.   The question is, whether the usurper has the power to enforce payment, and whether such rightful government has the power to protect the debtor in case of resistance, and that this ground existed here, is too plain for argument.   If efficacy is ascribed to a government coming in without legitimate right and against the consent of the people, by mere force, by stronger reason should it be ascribed to one coming in in such form as to carry with it, in the eyes of the people, legitimate authority, and with power, moral and physical, such as no purely usurping government ever possessed?   The payment could not be regarded as voluntary, so long as the government suffered the law to stand.   It had all the constraining force of a military order, with the added weight which a government upheld unanimously by the people imparted to it.

The supreme court of the United States, in Thorington v. Smith, 8 Wall. 1, speaking of the Confederate government, says :  " To the extent, then, of actual supremacy, however unlawfully gained, in all matters of government within its military lines, the power of the insurgent government cannot be questioned.   That supremacy did not justify acts of hostility to the United States, but it made obedience to its authority, in civil and local matters, not only a necessity but a duty.   Without such obedience civil order was impossible."   The court invest it with the character of the British

occupation of Castine, and intimate plainly that if it had taken the capital, and displaced the government of the United States, even temporarily, all its acts would have been binding on the country.

Now this complete displacement took place (if displacement at all) in the local government of Mississippi, and the question turns on that point.

So far, our examination of the question involved serves to show that, while there have been speculative views expressed by judges on the idea that the vindication of some political creed was called for, they all, with a noteworthy unanimity, rest their decision, as to the state governments, on the test adopted by the convention of 1868. Was the act done in furtherance of secession or rebellion, or, in other words, in "hostility to the United States."

In considering the question, whether the act of paying the debt with the consent of the existing government practically representing the state, was an act in violation of the constitution and laws of the United States, or done to further secession and rebellion, we are to bear in mind that this government was not solely an organization for armed resistance to the United States. It was a government mainly for peace, though it proposed, in case of need, to exert, and did exert, military power, such as pertains to states. In assuming the powers of the state government, it also took upon itself the duties of the state government as they were fixed by the constitution and laws of the state and fulfilled those duties with that measure, and by the means of which a condition of war admitted. While some of its legislation during the period of its existence was expressly designed to promote resistance, yet there was a large mass of legislation and administration which was not so designed, though these measures were influenced by the conditions which the war entailed. This consideration has, as it should, constrained the courts to distinguish between measures and acts occasioned by the war, from those designed to promote the war. The collection of debts and taxes due the state under existing laws,

put money in the treasury, but the government, at the same time, was paying the interest due to the Chickasaw counties, and the expenses of a system of civil administration indispensable to preserve society. The adaptation of laws to conditions resulting from the war, was a plain duty, because, in this respect, the people had a claim upon the government, the strength and justice of which have never been denied in a christian country. The condition which the people of all ranks, opinions and classes, and of all ages and sexes, were placed by the war, demanded measures adapted to their wants. Those wants were not treason, nor can we hold that to supply them was treason. A military commander besieging a city, may lawfully, by the usages of war, hang a man for furnishing provisions to a starving population, but a Mississippi court, after the war is over, applying this principle to measures of government, adapted to the wants of the people, would excite the wonder and indignation of mankind. We must, therefore, draw a line of distinction. War measures are very distinctly marked. They consist in raising and maintaining armies, the levy of troops and raising money by loan or taxes to pay them, and to purchase munitions of war. There was but one military tax levied by the state government of Mississippi, and that was levied by the convention of 1861. The revenue law of 1857, with modifications not designed to increase the taxes, continued in force throughout the war. The state government issued treasury notes, under laws passed expressing on their face that they were for the defense of the rebellion. There were laws passed to raise men to put in the army. About these laws so distinctly marked, there can be no doubt that they were designed to promote the rebellion. The military tax cannot be collected. The laws providing for the raising and arming of troops have expended their force. Those authorizing the raising of money for defense have been declared void, and the issues as constituting no valid obligation of the state, and the entire class

of laws in aid of the rebellion have been swept away and ended.

There was legislation manifestly designed to mitigate the consequences of the war, and to provide for conditions created by it ; the suspension of the statutes of limitation ; the replevin law, passed to give a speedy remedy for unlawful seizures by military officers, and other laws, which would not have been passed but for the existence of the war. These have been held to be valid. There is another class of acts and laws which are supposed to occupy a doubtful attitude, because their indirect effect was to benefit the currency, or strengthen the government, by relieving the people of distress.

In Thorington v. Smith, 8 Wall., carrying out the doctrine of Green v. Sizer, 40 Miss., the chief justice says : "They are transactions in the ordinary course of civil society, and though they may indirectly and remotely promote the ends of the lawful government, they are without blame, unless entered into with the actual intent to further insurrection."

The ordinary course of civil life must continue from necessity. The demands of civil society must be answered. A man, in agreeing to accept war currency in payment of a debt, or employing it in business, must know that these acts give credit and impart value to the currency, and that this value is the most essential element in the military strength of a country engaged in war ; yet these dealings are without blame, because we are bound to recognize in him wants and duties which must be answered. We recognize the fact that the existing government was performing the duties of a regular government indispensable to order, and imperatively demanded, and we are compelled to apply the principle just announced, and denounce as invalid only those measures which were plainly designed to promote the war, exempting measures promoted by duty and necessity. The particular methods pursued may have been, and, indeed, were compelled by the condition of things, especially the

condition of the currency occasioned by the war, and the recognition or acceptance of this currency by the state government, like its reception by individuals, had a certain, though indirect effect in keeping up its value ; yet the state must have declined to perform the duties of government or receive the currency, and deal with it, and we would be super-serviceable in the effort to condemn secession, if we followed these indirect effects as a test of validity, and would deserve to be classed with those religious enthusiasts of a past age, who, believing it to be a duty to avenge the crucifixion of the Saviour on the Jews, slaughtered Christians who had Jewish blood in their veins.

When we consider that the use of this war currency had become a necessity with the people, "to be regarded as a currency imposed on the community by irresistible force," and the exclusive currency, and that, in consequence of this necessity, the employment of it in business was without blame, it is quite impossible to impute blame to the railroad companies in employing it to pay their debts or to the state in receiving it. The issuance of the currency was illegal. The contract, as such, was of no valid obligation. 8 Wall. 11. The illegal act had exhausted itself when the state sold the currency or the Confederate government issued it. As a currency it acquired the character, by the force of circumstance, of money, and so entered into the business of life that the state government was compelled to treat it as money. Indeed the court say in Thorington v. Smith, that the Confederate money was imposed on the country by irresistible power and the acceptance of it in payment of taxes and other public dues was as much a necessity to the state as to individuals. We cannot conceive of the administration of government without money, and if the people had no other, if the business of the country yielded no other, if neither industry nor enterprise could command any other, the state must deal with it as money or surrender its functions. It was a party to an unlawful war, but it had also to maintain civil government. Whatever was done toward keeping up the

civil administration and enforcing the laws, in the protection of life and property, was a duty, and lawful by every test. A large amount of money was needed for this purpose, and the revenues declined with the war, and the condition of the people forbid the increase of taxes. The new state government assumed the powers, duties and obligations of the old one. That government owed the interest on the debt to the Chickasaw counties for schools. It had to support various public humane institutions and colleges. It must pay judges and officers, and support the vast expense of the administration of the criminal laws. The sources of income were the revenue under the revenue law existing and which was passed to meet ordinary expenses, and the debts due the state from the railroads, another source of income. To accept payment in the only existing currency to enable it to perform its duties, or authorize payment by a law which is the same thing, cannot, on principle, be held to be an act of hostility to the United States. If the ordinary sources of revenue were inadequate, the money paid in by the railroads might be fairly and lawfully employed for any of the general duties of administration, disconnected from the payment of troops and the support of armies, and there is nothing to indicate, in the dealing of the state with the railroads, that the prosecution of the war was the direct purpose of collecting these debts. The relation of debtor and creditor was created by law in 1856, the duties of the debtors and the state were imposed by that law. The roads were to pay the interest semi-annually, and the principal in seven years. It was made the duty of the officers of the state to collect the interest and principal, as it fell due. The provisions of the law were so stringent that no railroad could safely make default. Default in paying the interest rendered the whole debt due, and authorized the state officers to enforce payment by selling the stocks and bonds without judicial process. The stocks were four times the debt. Their sale would have inflicted irreparable injury on the stockholders. When the act of 1863 was passed, the

bulk of the principal borrowed had matured, or was about to mature. The state and Confederate government had compelled these roads to lend themselves to the armies, and to receive the government currency. Their earnings consisted in this currency.

In the contemplation of the government and the roads, the income was the source from which the interest and principal of the debt was to be paid. It was, therefore, a measure of justice to receive payment in this currency. That which was authorized by the act of 1863 was equivalent in the estimation of the government to specie, so far as it was concerned, for so the treasury notes were payable. If the debt had been called in in 1861, and especially if demanded in gold or silver, the measure would have worn the features of a war measure, for gold and silver was the chief need, and clearly, if gold had been paid, the payment would have been more hurtful to the United States than the payment of a depreciated money. One thing is clear, that, by no rule applicable to illegal intention, can the roads, in paying a debt due by a law passed before the war, be held to have intended to aid the rebellion. Indeed, the bill in this case does not charge this intention, and the act of 1863 was an act to carry out the act of 1856, by a process eminently just to the debtor, and least hurtful to the United States, and a wise and considerate measure for the benefit of the fund.

The payments of interest by the defendants, and half the principal, was made in the currency of the country, and accepted by the state, under the act of 1856. These payments were without any reference to the war, under obligations incurred prior to its occurrence, under a law which continued in force. The act of 1863 was passed in the regular course of legislation, dictated by the consideration, so far as appears, that legislation was called for on the expiration of the seven years' loan. The rightful government would doubtless have found legislation necessary. It would have varied, perhaps, from that adopted, owing to the existence of a different condition of public affairs, as may be sup-

posed ; but it is not probable that the attitude of the state to the fund would have been changed. It is quite evident that the counties interested preferred that the condition of things fixed by the act of 1856 should remain, and the condition of the country was not favorable to new schemes of investment. The act of 1863, therefore, simply continued the act of 1856, as to the attitude of the state, to the fund, a wise and just measure, and limited the right of payment in currency rather than extending it, confining it to that most valuable in the community, and deemed to be best for the state. There is not the slightest indication in the act nor in any collection previously made of a hostile purpose toward the United States nor is there a single feature making the transactions as measures of war.

The case of Texas v. White has a material bearing on this. If in that case there had been any thing to show that the conversion of the United States bonds was made under pre-existing valid laws, in the ordinary course of government duty, in respect to its legitimate functions, the sale would have been upheld. This inference is plain from the decision and the principle on which it proceeded.

The chief justice says, that, if the state had owed no relations to the United States, the insurrection, resulting in displacing the old government and erecting another, with all the places and attributes of power, such government might have made a valid disposition of the property of the state for any purpose whatsoever, but that it could not impart validity to any act of hostility to the United States, because of the relation toward them, and he directs the inquiry, not to the point, whether the new government had a legal origin and title, but whether the act of appropriation was marked by features which clearly indicate that its purpose was to promote the rebellion. The act itself by which the sale was authorized created a military board, charged with the public defense, and appropriated the bonds to that purpose. The purchaser was a volunteer and took the bonds, with notice of the illegal act, and the holder took them after

they were due, so as to be affected by the illegality. The difference is radical between this case and that of a debtor paying his debt to the state under a valid law which compelled him to pay.

The transactions are among the things past and done. There is nothing in them which requires that they should be re-opened, in order to vindicate the constitution of the United States, or to condemn secession as a doctrine. That which the creditor is willing to receive, and does receive, discharges the debt. If the state government, at the time, was the actual government, it was the creditor as much in this case as in the case of the taxes due the rightful government, and the payment in the currency of the day, without regard to its value, was an acquittance.

It did not occur to Judge Story, in the case of Castine, to inquire whether the British government received less than the United States was entitled to, nor whether the payment to the officers of that government was in exchequer bills below par.

It is not to be disguised, that the idea of usurpation of the state government is a theory adopted to justify measures by the United States deemed essential to its policy, as regards a state of thing existing at the close of the war, to wit: the displacement of functionaries, and the remodeling of the state government. That policy has been carried out. Secession has been effectually condemned, and the constitutional authority and supremacy of the United States fully vindicated.

It is obvious that if the legislature of 1865, under some impulse given by the counties interested in the school fund, who feared the loss of the fund, had not directed a suit to test the question, no suit would have been brought under the broad principles of the present constitution, and the light which judicial opinion has shed on the subject.

To sum up the result of this examination, it appears: 1st. That the railroads were not debtors to the Chicksaw school fund, and that, independent of any thing which took

place during the war, the state is still the debtor and the only debtor to that fund ; 2d. That it is not material to the question raised by the bill that the actual state government, which received payment of the defendants, had an unlawful origin, and was guilty of unlawful war, provided the particular transactions complained of were not done in aid of the rebellion, or in violation of the laws and constitution of the United States ; 3d. That the state government, though insurrectionary as to the United States, was the only actual government of Mississippi having undisputed and complete control of the whole power, civil and military, which pertained to any rightful state government, and did assume the functions and duties of the state government and administer them for more than four years ; 4th. That the payment in the war currency was not for that reason invalid ; 5th. That the payment was made under operative laws passed prior to the rebellion, under the constraint of power and the demands of duty, and that neither the act of paying or receiving bear any marks or evidence of a hostile purpose toward the United States.   That no illegal intention existed, and none has been charged by the bill.

These conclusions, established by the facts stated, and the laws and public acts cited by the bill, and the adjudications of the courts, and the principles of the present constitution close the door to judicial action.

*J. A. Campbell*, for appellee.

By act of July 4, 1836, congress granted a quantity of land equal to one thirty-sixth part of the land ceded by the Chickasaw Indians, within the state of Mississippi to the " state of Mississippi for the use of schools within said territory, in said state."   This land was disposed of by the state, and the proceeds constituted a trust fund for the use of schools in the territory composing the Chickasaw cession. In 1856, was passed an act of the legislature of the state of Mississippi, authorizing a loan to certain railroad companies (among them the appellant), of an amount of money

equal to all the money in the treasury arising from the sale or lease of the Chickasaw school lands, not to exceed $400,-000, on certain prescribed terms and conditions as to security, the interest on which was to be paid semi-annually, and the principal to be paid at the end of seven years.  Under this act the appellant obtained $199,000, in different sums and at different dates, as follows, to wit : $45,850, March 21, 1856 ; $50,000, May 7, 1856 ; $10,000, November 6, 1856 ; $27,000, December 18, 1856 ; $30,000, January 26, 1857 ; $10,000, same date ; $5,000, February 28, 1857 ; $4,000, same date ; $4,150, July 5, 1859 ; $9,000, June 14, 1859 ; and $4,600, November 28, 1859 ; in all, $199,000 ; and paid the accruing interest from time to time, and on the 18th of February, 1863, paid $45,850, and August 19, 1863, $50,000, on account of the principal.   On the 7th of December, 1863, an act of the legislature of Mississippi was passed, entitled "An act to enable the railroad companies of this state to pay the moneys borrowed by them."   After this the appellant paid into the state treasury as follows, viz. : $37,000, December 30, 1863 ; $40,000, January 29, 1864 ; $26,150, September 26, 1864.

On the 9th of January, 1861, was passed the ordinance of secession, entitled "An ordinance to dissolve the union," which was followed by "An ordinance to regulate the military system of the state of Mississippi," "An ordinance to raise means for the defense of the state," "An ordinance to amend the constitution of the state of Mississippi in certain particulars," which sought to remove every vestige of connection with the United States, "resolutions to provide for the representation of the state of Mississippi in the congress of a Southern Confederacy," and various other ordinances, designed to regulate the affairs of the independent state of Mississippi, and securely guard her against enemies from without.   This was followed by repeated legislative acts, calculated and intended to maintain the attitude of Mississippi.  She became a member of the "Confederate States of America," and, as such, co-operated with that government

in maintaining war with the United States.    Troops were raised of her citizens, treasury notes were issued to circulate as money, large appropriations were made from time to time, arms purchased, and liberal aid given to maintain the Confederate cause.    History has recorded the result !    The convention, assembled in 1865, passed "An ordinance to legalize and support the legislative enactments of the state of Mississippi, passed since the 9th day of January, 1861, and for other purposes," which excepted from its operation, among others, and guarded from its influence, the above recited act, entitled "An act to enable the railroad companies of this state to pay the moneys borrowed by them," approved December 7, 1863.    On the 21st day of November, 1865, was approved an act of the legislature of Mississippi, entitled "An act further to secure the indebtedness of the railroad companies in this state, on account of the money borrowed from the state under an act approved March 7, 1856," which imposed on the governor of the state the duty of demanding of appellant, among others, new bonds or obligations, and new securities for the money, which was due and owing to the state of Mississippi, on the 1st of January, 1863, on account of money borrowed by said company under said act of March 7, 1856.    The demand contemplated by this act was made, and not being complied with, this suit was instituted in the chancery court of Madison county, and the demurrer of appellant to the bill, having been overruled, the case was brought to this court by appeal.

From the foregoing statement it appears that the state of Mississippi, being a trustee of the Chickasaw school fund, derived from the act of congress of July 4, 1836, by her act of March 7, 1856, invested an amount equal to $400,000 of this trust fund in a loan to certain railroad companies, with a view to the security of the principal, and the semi-annual payment of the accruing interest for the benefit of the beneficiaries, and that, when secession occurred, appellant

was indebted to the state of Mississippi on account of this loan.

The question arising out of this state of facts is: Was the payment by appellant of principal and interest of this loan to persons professing to represent the state of Mississippi, from 1861 to 1864, inclusive, valid? Were the then controlling authorities, within the territorial limits of the state of Mississippi, entitled to receive payment of this debt? It is to be observed that $95,850 of the principal of this loan was paid in 1863, before the act of December 7, 1863, and as to this, the question involved is broader than whether that act was or was not valid. I propose to discuss, first, the question of the validity or invalidity of the payment, without the act of December 7, 1863, and afterward, the validity or invalidity of payments made under that act.

I. Were any of the payments valid? Three different theories have obtained in reference to the relations of the insurgent states to the United States during the late war, viz.: 1st. That the states had the right to secede, and, as a consequence, their ordinances of secession were valid, and all their acts, in harmony with their own fundamental law, were valid, as emanations from legally constituted political authority. This view has not received the sanction of any judicial tribunal; 2d. That enunciated and applied in Taylor v. Thomas, 42 Miss. 651, to wit: That the insurgent government of Mississippi was illegal, and its acts void, except in so far as validated by the rightful government which succeeded; 3d. That held in Texas v. White et al., 7 Wall. 700, to wit: That, notwithstanding her rebellion, Mississippi was a state whose "autonomy" was preserved, and, in so far as she had acted right, tested by the constitution and laws of the United States: wherein she did those things, the right to do which is inherent in every people united in a social compact, and about which the constitution, laws and public policy of the United States were indifferent, her acts will be upheld as the "will of power,"

not because she did them, but because of the propriety of the acts considered in themselves, as conservative of the rights of individuals. But all acts of Mississippi in furtherance or support of rebellion, or intended to defeat the just rights of citizens, and other acts of like nature, must be held invalid and void. Tested by either of the views, sanctioned by authority, the payments by appellant cannot be sustained. When secession occurred, a new political agency usurped the powers of government, personating the Mississippi of the union, and proceeded to collect the debt due to her. Mississippi, in her corporate capacity as a political agency, was not the Mississippi to whom this debt was due, and could not give a valid acquittance. The Mississippi of 1863 and 1864 was founded in wrong, existed alone by force, could levy contributions and enforce collections by power, but could not absolve a debtor to the rightful government of Mississippi. In name, in territory, and in the personnel of her citizens, she was the Mississippi of before ; but in the exercise of political power in 1863 she was not. With the same name, territory and persons, it may be, she had a totally different political agency. Constituted as part of the machinery of the government of the United States, she was wrested by violence and "treason" from the purposes of her creation, and converted into an agency for the destruction of the government of which she was a part. In so far as valid acts were done, they will be upheld, not *proprio vigore*, not because she did them, but because of the acts themselves. Her "autonomy" was not destroyed. She still existed ; her people were organized into civil society, but she had been deprived, for the time, of her legitimate government, and had been converted into an engine of hostility to the government of the United States. They who composed the then government of Mississippi were wrong-doers, usurpers, and though they exercised power, did it unlawfully, and could not bind the legitimate government by any thing they did. The doctrine of "an indestructible union, composed of indestructible states," is not

contravened by this view. The state of Mississippi was not destroyed; but her functions as a political machine were destroyed. Her rightful government was set aside. She was deflected from her constitutional orbit; she was seized and carried from her constitutional moorings; her flag changed; her crew displaced, and new associations formed for her; and, while she was the same craft, was navigated by a new and strange crew, and under a new charter party, and for different objects, she was recaptured and returned to her ancient moorings, and restored to her former management. Did the mutineers and usurpers have the power to bind her by their acts? Was Mississippi in 1864 the Mississippi of 1856? Is the lawful government of Mississippi barred of her claim by the receipt of usurpers of her government?

Appellant was not compelled to pay this money. It was voluntary, and, therefore, the doctrine of contributions, levied by the controlling power, does not apply. The appellant took the risk of the capacity of the party receiving to give a valid discharge.

Much of the difficulty besetting the solution of many of the *politico*-legal questions growing out of the late war has resulted from the unfortunate bewilderment in the vainly attempted application of the doctrine of *de jure* and *de facto* governments to the condition of the lately insurgent states, a doctrine which can have no application to them, and which should have no place in the consideration of these questions; a doctrine which belongs to independent states, and properly arises in the treatment of one independent state by another, or in the consideration by the succeeding power of an independent state of the acts of a former government of that state, as stated by the chief justice in Texas v. White: "If Texas had been a separate state, and not one of the United States, the new government, having displaced the regular authority, and having established itself in the customary seats of power, and in the exercise of the ordinary functions of administration, would

have constituted, in the strictest sense of the word, a *de facto* government." But the omnipotent sway of the "indestructible union," with its supreme law, the constitution and laws of the United States, silently, but magically and effectually, annulled and rendered legally inoperative every act of Mississippi in contravention of the constitution, laws or policy of the United States.

With the doctrine of "an indestructible union, composed of indestructible states," there is no escape for a state from the power of the constitution and laws of the United States, by which the validity of every act of the state must always be tested, whether that state be loyal and faithful, or struggling to be free from the bonds that bind it within the sphere of its constitutional relations. And the question is not one of *de facto* governments, but of conformity, or want of conformity, to that supreme rule of action furnished by the constitution and laws of the United States, which, though practically obstructed in their operation in the late insurgent states, were yet legally operative ; for a time suspended by the abnormal existent political condition during the war, but resuming their wonted practical sway as soon as the obstruction was removed, and as efficiently as before they were obstructed, resolving into nothingness every action that was aimed against them. Like the frosts of night, which form when physical obstruction prevents the influence of the power of the sun, and vanish before its returning rays, the many acts of the insurgent states which stood the long night of "rebellion," and resulted from the obstruction of the operation of the constitution and laws of the United States, vanished before their returning power, leaving none but such as could endure their operation.

The writings of publicists, and the decisions upon questions of international law, may throw some light on the questions to be considered, and thereby furnish some aid, but do not furnish a safe rule, by which to dispose of the questions arising out of our late struggle. These questions are *suorum generum* because of the complex and peculiar

nature of our government. They are domestic questions, arising out of the disputes of a family of states, and to be settled by the rules of the family government; to be tested, not by rules derived from the practice and consent of nations, but by the constitution and laws of the United States, the supreme law, the rod of Aaron which swallows up all the rods of political magicians, and buds and blooms to attest the living power that reigns supreme over these states, and before which every other must bow, and to which all else must yield, in token that the constitution is supreme and the union perpetual.

The question is one of municipal, and not international, law, and is to be tried by the principles and provisions of our constitutional government, and not by rules of public law. The case of Rice v. United States, 4 Wheat., is not applicable to this. It grew out of a war between independent nations, and was decided upon principles of international law not applicable to our struggle. That principle was, that goods imported into the island of Castine during its temporary occupancy by the British army were not brought within the jurisdiction of the United States, and were not, therefore, liable to pay duties to the United States after regaining possession of the island.

The cases of payment of debts to the sovereign, who acquires a right by conquest to collect them, are not applicable, for here there was no conquest, and the right to collect is the very question involved.

II. Did the act of December 7, 1863, "to enable the railroad companies of this state to pay the moneys borrowed by them," make valid the payments made before its enactment, and authorize the subsequent payments? I say no! This act had no force *proprio vigore*. It was not validated by the convention of 1865. It was expressly disavowed by the act of the legislature of 1865, entitled "An act further to secure the indebtedness of the railroad companies in this state, on account of the money borrowed from the state under an act approved March 7, 1856.". Sess. Acts of

1865, p. 147. It must stand or fall by force of its own inherent qualities, as an enactment by the legislative assembly of the usurpers of the political agency of the state of Mississippi, not confined to the transient existence of the usurpation, but attempted to be set up as a continuing protection to the party dealing with the usurpers.

This act was not a compulsory enforcement of collection of this debt. It was in the nature of a contract, whereby, on easy terms, to absolve the railroad companies from their obligations to the legitimate government of Mississippi. It was a contract between the state and the railroad companies, whereby this known trust fund in the hands of the railroad companies was to be transferred from the railroad companies, where it had been securely invested by the legitimate government of Mississippi, to the usurpers of the control of Mississippi, on the easy terms prescribed in this act. Could this law (in the nature of a contract) absolve the parties procuring it, and acting under it, from the debt it sought to have discharged? If so, where is the distinction between right and wrong? Between lawful authority and usurpation? Between the rights of A. and the power of B. to discharge them? Grant that the "autonomy" of Mississippi was not destroyed ; that legislative power still existed, and, when properly exerted, its acts were valid. The limit must surely be found in the constitution, laws and public policy of the United States, if not in the will of the rightful government of Mississippi, restored to the control of the state.

The ordinance of secession was, in legal contemplation, a nullity, and erected no barrier to the legal operation of the constitution, laws and policy of the United States, which mounted over the formidable lines of gallant soldiers with which Mississippi vainly sought to protect herself against their operation, and silently, amid the clangor of resounding arms, by their magical operation, annulled all legislative acts and contracts which were violative of the constitution or laws or public policy of the United States. The most favorable view for appellant is, that Mississippi, though

struggling to get out of the union, and though, practically, for a time out of it, was yet all the while, as to her legal status, Mississippi in the union, possessing just the powers she had before, capable of doing what would have been lawful if no practical disturbance of her condition had occurred; bound by her obligations as a state of the federal union; charged with the duty of observing the constitution of the United States, obeying its laws, and jealously conserving its policy, which, to her, were of paramount obligation. Therefore, all acts of the state during the war are to be held valid or not, according to their conformity or want of conformity to the constitution, laws or policy of the United States. Tried by this test, the act of December 7, 1863, cannot be sustained. It certainly was "in aid of the rebellion."

On the part of the railroad companies it was an effort to pay a valid debt, payable only in gold or silver, on the easy terms of discharging it with the depreciated currency they had on hand. They treated with the parties in power in Mississippi, at war with the United States, on the basis of furnishing a large sum of money ($1,000,000 in all) to maintain their warlike operations. They took the risk of the capacity of the contracting party to give a valid discharge of the debt. They were anxious to pay this debt with their abundance of treasury notes, and availed of the straightened condition of the public treasury of the usurpers to procure this act to enable them to pay. On the part of the state authorities, it is manifest that the act resulted from the opportunity offered to supply the wants of a depleted treasury.

We thus see the motives of the contracting parties. The railroad companies, anxious to pay with their earnings in depreciated currency, and in order, on so easy terms, to discharge their obligations, otherwise payable only in gold or silver, ready to contribute a large sum of money to the warlike operations being carried on, while the authorities of the state, in their need, were desirous to obtain the aid and

relief this money would afford.    The result was the act cited.    Can this arrangement be upheld?    Was this not "in aid of the rebellion?"

Mississippi was confederated with other states, in violation of the constitution of the United States, to resist and subvert the authority of the United States, and every contribution to her treasury was an aid to her attitude of hostility.    Every dollar collected was to maintain a civil and military establishment at war with the United States. How, then, can voluntary contributors to the cause of rebellion invoke the benefit of their act as a defense against the claim asserted by the rightful creditors?

This act of December 7, 1863, was plainly in furtherance of the scheme of hostility to the United States.    It was a part (and no unimportant part) of the war then being carried on.    It was a scheme to raise money, aptly called "sinews of war."    It was in furtherance of a palpable violation of the constitution of the United States, in that it was in consummation of the illegal and unconstitutional issuance by the state of her treasury notes, the circulation of which this act was designed and calculated still further to facilitate. As an effective war measure, treasury notes were issued, and large appropriations made, and, in order to make the treasury notes current, it was necessary to create an active demand for them, and preserve an equilibrium between the demand and the supply.    This act of December, 7, 1863, had the double object and effect to supply the treasury (which gaped for the means to meet the heavy drafts on it for war purposes) and to impart additional currency and value to the treasury notes, in the promotion of an increased demand for them, by reason of their receivability by the railroad companies, and by the state authorities from them.

This act was thus an efficient means of, not only furnishing a ready supply of needed money, so-called and treated, but of imparting increased efficiency to the financial scheme of the usurpers of the government of the state.

A cursory review of the legislation of Mississippi, during

the period referred to, will sustain the view just presented. "An ordinance to raise means for the defense of the state," passed by the convention, January 26, 1861, provided for " certificates of loan or treasury notes," to an amount not to exceed $1,000,000, one-third to be redeemable in one year, one-third in two years, and one-third in three years, from the 1st of June, 1861, the proceeds of which were to constitute " a part of the military fund " for the " military service of the state." A special tax was levied for the redemption of these notes. By act of the legislature of 29th November, 1861, provision was made to carry into effect the foregoing ordinance, and to make said " certificates or treasury notes " receivable in payment of taxes, whether before or after they were due. Acts November, 1861, p. 45. December 19, 1861, "An act authorizing the issuance of treasury notes as advances upon cotton " was passed. Sess. Acts, p. 59. This provided for $5,000,000. January 29, 1862, " An act authorizing the issuance of treasury notes on behalf of the state," was passed. Sess. Acts, p. 286. This provided for $2,500,000. The chief feature of value in these treasury notes was their receivability in payment of dues to the state. It was that which made them current. But, to make this operative, it was necessary to create a demand for them, and this was done by making large appropriations from the treasury, and levying heavy taxes, to meet which the tax payers were eager to get enough of these treasury notes to pay their taxes. On the 21st November, 1861, was passed " An act to authorize the governor of the state of Mississippi to accept volunteers for immediate service in support of the Confederate troops at Columbus, Kentucky, or elsewhere as they may be needed," and $500,000 were appropriated for that purpose. Sess. Acts, p. 48. December 10, 1861, $250,000 were appropriated " out of any money, or treasury notes heretofore authorized," for the defense of the sea coast of the state of Mississippi. Sess. Acts, p. 132. The Act of January 29, 1862, authorized the governor to call for 10,000 volunteers. Divers other appropriations were made,

amounting in the aggregate to a large sum.   Finally, on the 9th December, 1863, two days after the act to enable the railroad companies to pay the moneys borrowed by them was passed, "An act making appropriations for the military service for the next fiscal year," whereby $2,400,000 were appropriated for that purpose.   Sess. Acts, p. 202.

For a time this financial scheme worked well, and every thing went on smoothly and "merry as a marriage bell." But, as commerce ceased to pour its stream of wealth into the country, and industry to yield its accustomed fruits of plenty and prosperity, the pressure of the disordered monetary condition of the country was felt.   Distrust began to exist, and suspicion cast its damaging influence on the currency of the country.   The unsoundness of the financial scheme was discussed.   The perpetual round of paying out and collecting in, to be paid out again, these treasury notes, which could be printed *ad libitum*, began to discover its weakness and excite doubt and distrust and cause depreciation.   The pressure of "hard times" excited popular clamor against the collection of the "specie tax," to pay the military tax provided for by "An ordinance to raise means for the defense of the state," passed by the convention, January 26, 1861, and, on the 3d January, 1863, an act of the legislature was passed suspending the collection of this tax until twelve months after the close of the war.   In connection with this act was passed a preamble and resolutions, explanatory of the reasons inducing the legislature to suspend the collection of this tax, in which it was recited that "a large part of the northern portion of the state being in possession of the enemy, nearly all of our western border beleaguered by their armies and fleets, threatened with invasion on the east, and our territory already occupied on the southern border, with two-thirds of the cotton crops of the state destroyed under the authority of the Confederate government, and gold and silver driven from the country by reason of the blockade of our ports, and the prevalence of the war throughout the Confederacy, it is a physical impos-

sibility to collect the tax in gold and silver:"    Acts of 1862
and 1863, p. 97.    The act of December 1, 1863, extended the
time for the collection of taxes until the first of June.    Acts,
111.    In this straightened condition, and amid these difficul-
ties, was adopted the expedient of "An act to enable the
railroad companies to pay into the treasury the money
borrowed."    Acts, 160.    The motive to which, on both
sides, is plainly to be seen, and to disguise somewhat its
true object, it was provided that such payment should be
made "in gold and silver, or in the treasury notes of this
state."    Manifestly, as "gold and silver had been driven
from the country" so early as January 3, 1863 (see pre-
amble and resolution of that date above referred to), and
Mississippi was more sorely pressed than before, no other
thought was entertained than to obtain payment in treasury
notes.    And in order to insure speedy payment of the much
needed funds, it was provided that the full amount of this
indebtedness should be paid on or before the 1st of May,
1864.    It was a *desideratum* with the railroad companies to
pay their debt as a means of beneficial appropriation of
their earnings in this currency, and a *desideratum* with the
state officials to get the currency, which it suited the rail-
road companies to pay, and the promotion of their mutual
convenience and advantage was rendered mutually more
desirable, by the wholesome influence exerted upon the
system of paying in and paying out, in its effects upon the
currency; for it increased the anxiety of railroad companies
to get it, since they were now able to use it profitably, and
the readiness of these great corporations, which always
exert much influence on the monetary affairs of a country,
to take this currency had a sustaining effect with the public,
and thus imparted increased value to the treasury notes.
If the validity of a law is to be judged of by its results,
this must be classed as "in aid of the rebellion."    If to be
determined by the motive of the law-making power, as
manifested by the act itself, and precedent and contempora-

neous history, no other classification of the act under consideration can be found.

If we look beyond the act in question, and consider the action of the railroad companies, on which they now base the right of defense against the claim of the state, in its nature and effects, as connected with the rebellion, while we may fully concede their motive to have been individual benefit to themselves, we behold it, in its direct results, as a voluntary contribution of the sinews of war to the deadly enemies of the United States.

The object of the act of December 7, 1863, aside from current history and contemporaneous legislation, is apparent from section 2, which provides, that any money paid into the state treasury, under the provisions of this act, may be used in payment of any "debts and appropriations of the state, in the same manner as other funds belonging to the state are used." What "debts and appropriations?" Undeniably, debts incurred and appropriations made in maintaining the hostile attitude of Mississippi to the United States. Two days after this act, $2,400,000 were appropriated for the "military service of the state" for "the next fiscal year," and the money to be paid in by the railroad companies, before the receipt of taxes, the collection of which had been extended to the first of June, was to be "used in payment of any debts and appropriations of the state in the same manner as other funds belonging to the state are used." As the treasury was empty, and there were large drafts upon it, and popular clamor had caused the postponement of the collection of taxes to the first of June, and final settlement by tax collectors until the thirty-first of July, a present supply was sought to be obtained, by authorizing payment by the railroad companies, and payment was speeded, by making the privilege conditional on payment by the first of May, 1864. See the proviso to the second section of the act, p. 160.

In Texas v. White et al., 7 Wall. 700, it was held that Texas did not lose her right to certain bonds (debts due her)

on their face payable to bearer, but which her act of 1851 had declared should not be transferred without the indorsement in Austin of the governor; because (they held) the act of 11th of January, 1862, dispensing with the requirement of the indorsement by the governor, was tainted with illegality, in that the object of such repealing act was to facilitate the transfer of the bonds in the interest of the rebellion. And they were afterward transferred in pursuance of the general purpose, which the history of Texas plainly showed led to the repeal of the requirement of indorsement, and when it was urged upon the court that the bonds were sold in payment for "cotton cards and medicines," goods capable of a use entirely legitimate and innocent, and therefore payment by transfer of any property of the state was not unlawful, the reply of the chief justice was, that the "enlarged powers of the board (by virtue of which the board made this contract) appear to us to have been conferred, in furtherance of its main purpose of war against the United States, and that the contract under consideration, even if made in the execution of these enlarged powers, was still a contract in aid of the rebellion, and therefore void. And we cannot shut our eyes to the evidence which proves that the act of repeal was intended to aid rebellion by facilitating the transfer of these bonds." Therefore, the act was held void, and the "title of the state to the bonds" was not divested by the act of the insurgent government.

The case cited is this case *mutatis mutandis*. The parallel between the two is complete. The astutest logic cannot discover the slightest want of perfection in the completeness of the analogy between them. To do so will require the

"Skill which can distinguish and divide,
A hair 'twixt south and south-west side."

The Texas bonds were a debt to the state. So was the money due Mississippi from the railroad companies. The Texas act of 11th January, 1862, dispensing with the requirement of the governor's indorsement, was intended to aid rebellion, by facilitating the transfer of the bonds. The Mis-

sissippi act of December 7, 1863, was intended to aid rebellion, by supplying an empty treasury with ready money to meet the demand upon it, to maintain the warlike operations of the state, with the further object of facilitating the circulation of the treasury notes as money in community. The Mississippi act in question was more than an act designed to facilitate the transfer of these debts, in the interest of the "rebellion." It was an actual transfer and appropriation, in maintenance of the "rebellion," and, if the design to facilitate a transfer annulled a law, a fortiori will the consummation of such design have that effect. The Texas "board of public works" had, for its main purpose, war against the United States, and its contract for "cotton cards and medicines" was a contract in aid of the rebellion, and therefore void. So Mississippi was hostile to the United States in all her departments. Her main purpose was war, and her legislative acts, with unvarying aim, were in furtherance of her main purpose of war against the United States. Her legislature was but a military board, whose main purpose and chief engagement was war. The title of Texas to her bonds was not divested by the act of the insurgent government. Nor was the title of Mississippi to her bonds, due from the railroad companies, divested by the act of her insurgent government. That the insurgent government disposed of the debt to the debtor, instead of a third person, cannot alter the principles applicable; and, to test the question, let it be supposed that the debt had been sold to a third person for money to maintain the insurgent government.

The case of Texas v. White, apart from its authority, rests on sound principles, and furnishes a rule easy of application and satisfactory in its result, whereby to uphold all acts of the state in hostility which conserve the rights of individuals and society, and to annul all others. Thus furnishing the long-sought and much-needed clue to guide our judicial tribunals safely through the labyrinthian difficulties,

which beset their arduous pathway, out of the late unhappy struggle.

The utmost strength of the argument for a contrary view was exhausted by Justice Grier in his dissenting opinion in Texas v. White, above cited, who urged that the contest was between Texas and her own citizens; that it was a matter of insignificance to the United States to whom payment of the bonds was made, and that, in disputes with her own citizens, Texas was estopped from denying her identity and repudiating her act; but in this view he stood alone in dissent from his seven brethern of the bench.

Upon the principles of Thomas v. Taylor, 42 Miss. 651, there is an end of the argument. It was held, in that case, that the government of the state of Mississippi, as one of the Confederate states, was not identical with the government of Mississippi, as one of the United States, and that the acts of the former were not, *ipso facto*, binding on the subsequent government of Mississippi. That it rested with the rightful government succeeding to validate or invalidate the acts of the insurgent government. The act of December 7, 1863, was not validated, but distinctly repudiated by the act of November 21, 1865. In that case, the act of 19th December, 1861, in virtue of which the treasury notes were issued, as advances upon cotton, was held void, because believed "in its operation and effects to have been in aid of the late rebellion," "and therefore was not revived and continued in force by the ordinance of the convention of 1865." "These notes were intended to supply an important part of the revenue by which the state government was to be sustained, and enabled more effectually to aid the Confederate government in the prosecution of a sanguinary war, waged expressly for the purpose of subverting the government of the United States." Therefore, they were void. All which may be affirmed of the act of December 7, 1863, as to its intent, and "operation and effects," as also of the act of the railroad companies in making payment. Appellant well knew the important office performed

by money in sustaining the "rebellion;" knew the purpose for which this money was wanted, the need out of which this act grew, and the intent in passing it. In fact the railroads procured the act. Large appropriations, payable out of any money in the treasury, had been made before any payment was made, and within two days of this act, $2,400,000 had been appropriated for military purposes for the next fiscal year.

III. But, if all the foregoing be wrong, still I maintain that, as to the payments made by appellant after December 7, 1863, they were not valid. It is manifest that that act was deemed necessary to authorize payment, and was procured in order to secure the coveted privilege of such payment. It was, therefore, as it has been before denominated in this argument, in the nature of a contract between the railroad companies and the state. It contained the terms on which the state agreed to permit this gold and silver debt to be discharged in a depreciated currency. If valid for any purpose, so for all, as to appellant. It is unmistakable that full payment by the railroad companies against the 1st of May, 1864, was the condition on which the benefits of the act were extended. Payment by the 1st of May, 1864, was a condition in the authority of the fiscal officer of the state to receive payment. The act of 1863, no doubt, originated in a well-founded doubt of the right of the fiscal officer to receive such payment. The anxious desire of the railroad companies to pay just then, and the pressing wants of the depleted treasury had caused the railroad companies to risk the payment and the state officers the receipt of $95,850 in advance of the maturity of the debt, and in anticipation of the necessary legislation. But the act of the 7th December, 1863, was obtained, and it contained an expression of the legislative terms on which payment, as provided, might be made. Those were full payment by 1st of May, 1864. Without that, the receipt of the fiscal officer was without the scope of his authority, illegal and void, and in receiving the treasury notes from

the railroad companies, after 1st of May, 1864, he was the mere bailee and depository of the payors, and by payment of part of the money, and failure to pay all, by the 1st of May, 1864, the appellant lost the right to claim any thing under the act of December 7, 1863, with whose terms it had failed to comply.

To conclude, my several propositions are:

1. The payments made by appellant were not a discharge of the debt to the state of Mississippi, independently of the act of December 7, 1863, because made to persons not entitled to receive payment, being usurpers of the control of Mississippi, and not representing the political authority of the rightful government of Mississippi; because it was not a compulsory payment, but a voluntary contribution "in aid of the rebellion," now invoked as a discharge of the debt due to the political authority the payment was made to subvert and destroy.

2. The payment was not good under the act of December 7, 1863, because it was void as "in aid of rebellion," whether judged by its intent, or its "operation and effects."

3. The payment was not good, if the act of December 7, 1863, was valid, because not made in accordance with the terms of the act. See, also, Kelley v. State, 25 Ark. 392; Hall v. Hall, 43 Ala. 488; Powell v. Boon, ib. 459; Ray v. Thompson, ib. 434; Chisholm v. Coleman, ib. 204; United States v. Kuhler, 9 Wall. 83; United States v. Padelford, ib. 531; Hickman v. Jones, ib. 197.

The proposition of counsel for appellant, that the act of December, 1863, and the payment by appellant, have been validated by the ordinance of the convention of 1868, is not maintainable. For the act of December 7, 1863, had performed its office, was *functus officio*, and not then in force, and therefore was not in the contemplation of the convention. But the act of November 21, 1865, disavowing the act of 1863, and the payments under it, and directing the institution of this suit, was then in force, and according to the

line of argument by counsel for appellant was validated by the ordinance of 1868, which acted on laws in force by their terms. The act of November 21, 1865, repealed that of December 7, 1863, and the repealing act was in force and validated.

Nor can sanction be given to the position that the political control exercised in Mississippi after secession was insurrectionary as to the United States, but not as to the state. That precise question was involved in Texas v. White et al., 7 Wall. 700. That contract was between Texas and her own citizens as to the validity of a transfer of certain bonds belonging to the state prior to secession. It did not concern the United States, but involved the validity as concerned Texas and her citizens, of a domestic transaction affecting the rights of Texas alone and not the United States, and it was held that the state was not divested of title by the disposition made of the bonds.

A clear view may be had by considering what is the government of a state. True, the so-called and the actual government in Mississippi was not insurrectionary as to the people in Mississippi; but the people are not the state in the full sense of that complex term, though they make the state. Neither the name, nor the people, nor the territory, nor all combined, make the state in the sense of its political individuality. The name is merely a convenient mode of designation. The people may change, and the territory be altered, but the state, in her political individuality, is not changed. The government is the vital principle, the soul of the state, so to speak. It is incorporeal, metaphysical, ideal, abstract. We know its origin, history, and visible bounds, as defined by the constitution; we see its manifestations, and feel its power; but the political individuality which we denominate the government is but a mental conception, intangible and invisible. It can exist only according to the law of its being; change that, and the government is changed, even though the same name, people and territory be preserved. They may change, but the government remains. Let them

be changed, and change the constitution, the fundamental law, that which makes the political individual, constituting the personality of the state, and, *ipso facto*, the government resulting from the change becomes another government, a different political personality, and, though strongly resembling the other, not identical. *Nullum simile, et idem.*

The manifestations of political power in 1863-4, though made by the same people, were, in virtue of a fundamental law, different from the former constitution of Mississippi, and therefore the then government was not identical with the former.   If the two governments were not the same, the payment by appellant was to the wrong person.  One political individuality was creditor, and another received the debt.   I desire to impress the fact that the first payment by appellant was made before any part of it was due, and voluntarily ; and, if the territory of Mississippi had been occupied by the arms of Great Britain, the pretended payment would not have constituted a discharge of the debt. *Vide* Halleck's Int. Law and Law of War, p. 805, § 28.

Where is to be found the limit of the power of the controlling authorities in Mississippi, according to the argument on the part of appellant ?   Could they have sold the capitol and other public buildings and lands, and all other public property?   Could they have suspended taxes, and issued bonds to the amount of millions, not for war purposes directly, but for maintenance, which would have been obligatory on the state succeeding ?   It is urged that the actual authorities had the right to maintain themselves, *cui bono.*   Their existence was "treason," and their purpose and employment war against the United States.   Did they have legal right to maintain existence for that ?   Their entire existence consisted in that.   The true view, derived from a consideration of the nature of our government, is that the people of a state, because of their double allegiance, paramount toward the United States in its sphere, are incapacitated to exercise political authority through the instrumentality of a political agency made to war against

the United States. There was an actual government, but not lawful political authority. A government existed, but not the government of Mississippi, the creditor of appel lant.

The recognition of the validity of such acts of the actual government during the war, as pertained to the economy of private life among the citizens, depends on no higher principle than comity. In so far as the rightful government, restored to control, sees proper, it will regard as valid, the acts of the controlling authorities during the war, but no further.

The reconstruction acts of congress, emanating from the political department of the government of the United States, are decisive of this question. Reconstruction implies destruction. What is destroyed? Neither name, people nor territory, but the government of Mississippi.

The political department of Mississippi, too, has spoken on this subject. It recognized the government of Mississippi as having been set aside. It " reconstructed." It refused to validate the act of December 7, 1863, and payments made by appellant, and it disavowed both, and directed this suit to be brought, and the highest political authority of this state has sanctioned, approved, validated the legislative act of 21st November, 1865, by virtue of which this suit is here. The doctrine of " heirship " by conquest completed, has been invoked, but in vain, for here there was no conquest.

Conquest is the acquisition by an independent state or nation of the territory of another, and is lawful according to international law. Conquest is lawful, but the creation of the new government was unlawful, and hence important differences. International Law by Halleck, p. 806, § 29. The supreme court of the United States in Smith v. Thorington, 8 Wall., was considering the question of the lawfulness or unlawfulness of a contract by citizens for payment in Confederate money, and not the validity of acts of pretended governments.

*C. C. Shackleford*, for appellee.

The state of Mississippi filed her bill in the chancery court of Madison county, to recover from the appellant certain bonds and moneys, or their equivalent, which the road had taken up during the rebellion.

These bonds had been given by the road to the state, as security for the payment of money borrowed by the road from the state. The money so loaned and borrowed by the road was denominated the Chickasaw school fund. These loans were made by the state to aid in the construction of the various railroads in the state of Mississippi, of which the appellant was one. This fund was a special one, and belonged to the Chickasaw counties as a school fund. The loans were made in the years prior to 1854 to 1861, the state of Mississippi being trustee of this fund for the benefit of the counties to which it belonged. This fund arose from the bounty of the government of the United States.

The war that arose from the act of the state of Mississippi, in disputing the jurisdiction of the government of the United States, resulted in the overthrow of the insurrectionary government and the restoration of the government of rightful jurisdiction. During the existence of the war the several railroads of the state sought to pay their debts due the Chickasaw school fund, of which the state was trustee, in the notes or obligations of the state, made and issued while in rebellion and in aid thereof. For this purpose and to effect this end, an act of the rebel legislature was procured to be passed, which authorized the several roads to pay the aforesaid indebtedness before the same became due.

Some of these debts were paid before the act authorizing the payment was passed. This act, under cover of which the roads seek to protect their action, was passed in December, 1863, while this state was in open rebellion, and will be found at page 160 of acts of that session.

It is deemed useless to go into the inquiry of the act of secession, the power of a state to dispute the constitutional jurisdiction of the federal government, or rehearse the pro-

gress and downfall of the state in rebellion, and its progress of reconstruction to the establishment of the present govern ment.

The act of secession has been held to be void by all the departments of the government of the United States, hence the record presents but two propositions for the consideration of the court, and appellants must establish one of two propositions :

1st. That the rebel government was a *de facto* government, and, as such, was a legal government, and its legislative acts legal and binding.   2d. If the rebel government was an illegal government, this act of December, 1863, p. 160, was not in aid of the rebellion, and has been ratified by the government *de jure*.

Counsel for appellant assume that the government in Mississippi, from 1861 to 1865, was a government *de facto* or legal government ; this is the corner-stone on which their whole argument rests.   This assumption is not admitted by appellee, and without this fact admitted, the superstructure falls to the ground.

1st. Because the question is a political not judicial one, and the judiciary must conform to the action and ruling of the political power in all questions of this character.   See Luther v. Borden, 7 How. (U. S.) 7–10 ; 17 Curtis (U. S.), 10 ; United States v. Palmer, 3 Wheat. 610 ; City of Berne v. Bank of England, 7 Vesey, 347 ; Wheat. 407 ; 3 Cald. (Tenn.) 160 ; 6 Wall. 13.

This being true, has the political power of the government of the United States at any time recognized the Confederate government or the government of the state in rebellion as governments *de facto ?*   It is impossible for any such act to be shown, because the government of the United States, in all its departments, have never regarded or acknowledged the government of the Confederacy, or any of the states subordinate to its power and authority, as other than a body of armed insurgents, whose pretended acts of governmental power were wholly void.   This was

the position of the executive of the United States in 1865, when armed resistance ceased.

This was the position held by W. L. Sharkey, the military governor appointed by the executive of the United States. The congress of the United States, the political power of the nation, ever regarded the Confederate government as an illegal government, also the states composing that government, and their acts void, except when ratified or made valid by the rightful incoming government. See the various acts of congress, the reconstruction acts, etc.

The judicial power of the government of the United States has followed the rule adopted by congress, and held that the Confederate and rebel state governments were mere insurrectionary bodies and not entitled to be considered as governments *de facto*. Reference is made to the case reported in 6 Wall. 13. In Hickman v. James, 9 ib. 197, 201, the court say: "The act of the Confederate congress creating the tribunal (a Confederate court) in question was void. It was as if it were not. The court was a nullity, and could exercise no rightful jurisdiction." In case of United States v. Keehler, 9 Wall. 83, the court say: "The whole Confederate power must be regarded by the federal courts as a usurpation of unlawful authority, and their congress as incapable of passing any valid laws." This being the fact as to the Confederate government, the rule must apply with equal if not greater force to the state governments subordinate to the Confederate government. But the case of White v. State of Texas, decided in 7 Wall., is decisive of every question presented by the record in this case. On examination the ruling in that case will be found as applicable to the facts of this, and decisive of the questions arising under the pleading in this.

In addition to the authorities cited above, reference is made to the case of Taylor v. Thomas, 42· Miss., wherein this court held that the rebel government was not a *de facto* government, that the question was a political one, and that this court would follow the rule adopted by the political

power of the government of the United States and recognized by the supreme court of the. United States.

The next question upon which the appellant must rely for a favorable decision, as we have shown that the government to whom the payment was made was without power or authority to receive the same, is that, if the rebel government was an illegal government, this act of December, 1863, page 160, was not in aid of the rebellion, and the payment has been satisfied by the government *de jure.* It cannot be shown that the payment was made in good faith, and with no design to aid the rebellion. Neither can it be shown that the act of payment, or the legislative act under which the railroad pretended to act, have been ratified by the legal government or the legal government *de jure,* since its restoration. On the contrary, even this act of December, 1863, under which these roads sought to shield this most disreputable transaction from the obloquy and merited condemnation of just men, has not prevented this transaction from being denounced as a fraud on the people of this state by every legislative body assembled since the suppression of the rebellion and the restoration of the legal authority.

The convention which assembled at the instance of Governor Sharkey, feeling and believing that all the acts of the legislative branch of the government enacted during the war were without authority, and void, sought to make them valid by an act of ratification; but this act of December 7, 1863, page 160, was exempted from the saving clause in that act of ratification. See proceedings of Convention of 1865, p. 40.

Again, when the legislature created by the convention of 1865 met in session, one of its first acts was to repudiate the fraudulent payment made by the road, and direct the governor of the state to institute legal proceedings against the road, to recover the possession of the bonds so wrongly and fraudulently taken. See page 147 of acts.

For the argument of the case nothing further need be said. We have shown: 1st. That the payment was made

to irresponsible persons, without authority to collect or receive payment for said bonds; that such payment must, therefore, be null, void and of no effect. 2d. We have shown that this act of December 7, 1863, has not been ratified and made valid by the true legal government since its restoration, but, on the contrary, it has been repudiated by that government on all proper occasions. Believing on these two points the merits of the case rest, we shall not enter the proposition of the fiduciary character of the state, as a trustee for this fund, though we hold that the state was a mere trustee, and, as such, could not change the character of the liability, except with the consent of the parties in interest. Considering that the points presented as above will be decisive of the case, a further consideration of the question of trusteeship is waived.

PEYTON, C. J. :

By an act of congress of the 4th of July, 1836, a quantity of land, equal to one-thirty-sixth part of the land ceded by the Chickasaw Indians, within the state of Mississippi, was granted to said state, for the use of schools within said territory in said state so ceded as aforesaid by said Chickasaws. This land was sold or leased by the state and the proceeds thereof were placed in the treasury of the state, and constituted a trust fund for the use of schools in the territory composing the Chickasaw cession.

In the year 1856 an act of the legislature of this state was passed authorizing a loan to certain railroad companies of an amount of money equal to all the money in the treasury arising from the sale or lease of the Chickasaw school lands not to exceed $400,000. Under this act the appellants obtained at different times the sum of $199,000.

On the 7th day of December, 1863, another act of the legislature was passed entitled "an act to enable the railroad companies of this state to pay the moneys borrowed by them." And, on the 21st day of November, 1865, was approved an act of the legislature of this state, entitled,

" An act further to secure the indebtedness of the railroad companies in this state on account of the money borrowed from the state, under an act approved March 7, 1856." This act made it the duty of the governor of the state to demand of the appellants, among other things, new bonds or obligations and securities for the money which was due and owing to the state on account of money borrowed by said company under said act of March 7, 1865. The demand contemplated by this act of 1865 was made, and not being complied with, the appellee filed her bill in the chancery court of Madison county, alleging the loan as aforesaid to the appellants, of $199,000, at different times, before the 9th day of January, 1861, and that since that time, and before the 7th day of December, 1863, the appellants paid to the insurrectionary government of the state of Mississippi, the sum of $95,850 of the money loaned as aforesaid, and that, since the 7th of December, 1863, the appellants paid to the said insurrectionary government the sum of $103,150. The bill charges that these payments were not made in gold or silver nor in the lawful money of the United States, but in treasury notes issued by the insurrectionary government of the state of Mississippi. The bill prays that these pretended payments may be decreed by the court to be null and void, and that an account be taken and stated of the amount of principal and interest due from the defendants to the complainant, and that the defendants be decreed to pay the same.

The defendants demurred to the bill. The demurrer was overruled by the court, and the case comes to this court by appeal on the part of the Mississippi Central Railroad Company, who assign for error the action of the court below in overruling the demurrer to the bill of complaint. We approach this case with a due sense and proper appreciation of its magnitude, and have given it that deliberation and mature consideration which its importance demands.

The main question presented by this record for our solution is, was the payment by the appellants of principal and

interest of this loan, to persons professing to represent this state from 1861 to 1864 inclusive, a valid payment.] In the decision of this case we feel relieved from the necessity of discussing the powers of the government of the state of Mississippi during that period.   Suffice it to say that it was insurrectionary and revolutionary in its character.   The government of the state of Mississippi of the United States was not the government of the state of Mississippi of the Confederate States.   The government of the former was overthrown and destroyed by the establishment of that of the latter.   The money sued for was borrowed by the appellants from the legal government of the state as a member of the federal union, and to that state was the obligation of the appellants to repay it, and they were not released from that obligation by a payment to any other government or authority than that of the state of Mississippi, as a member of the United States, acknowledging the constitution and paramount authority of the government of the United States.   Whatever effect may be given to acts produced by necessity or paramount force, it is not pretended that any inevitable necessity existed, or that any physical force was used, or even pretended, to compel the appellants to pay the money borrowed to the insurrectionary and revolutionary government of the state.   Nor is it in the least inconsistent with the fact that they might have been desirous and willing to make the payment upon the very favorable terms proposed by the legislature.   They show no effort to retain or secure the funds to the legitimate government, to which it was due and owing.   Nor does it appear that they would have suffered any inconvenience, or been punished in any way by the authorities of the insurrectionary government of the state, if they had refused to pay the money to those authorities.   There was no inevitable overpowering force to compel the payment.   Nor does the act of the legislature of the 7th of December, 1863, contemplate any such thing as compulsion; for it provides in the first section "that the railroad companies in this state

be and they are hereby authorized to pay into the treasury the sums of money by them respectively borrowed."

The money loaned the appellants was good funds. It was regarded as a gold and silver debt, and yet the said act of the legislature authorized the railroad companies, to which these funds were loaned, to pay the sums borrowed by them respectively into the treasury in treasury notes of the state. As a historical fact it was well known that the fortunes of the Confederacy were at that time on the wane, and that these treasury notes were greatly depreciated and that the sinews of war were much needed. The treasury required replenishing and this was the mode adopted by the legislature to aid in effecting that purpose, and the appellants, no doubt, cheerfully availed themselves of the opportunity thus offered of paying a par debt in depreciated notes, which, however, would aid the state in the prosecution of the war waged for the express purpose of subverting the constitution and government of the United States. For the second section of this act provides "that any money paid into the state treasury under the provisions of this act may be used in payment of any debts and appropriations of the state in the same manner as other funds belonging to the state are used." And it was a matter of public history, and therefore well known to all, that at the time the resources of the state were heavily taxed to raise the means of carrying on the war.

It will be seen that we are not without authority for the positions we assume in the discussion of this case. In 1851, the United States issued five thousand bonds of $1,000 each, amounting to $5,000,000, to the state of Texas in arrangement of certain boundary claims made by that state. The bonds, which were dated January 1, 1851, were coupon bonds, payable by their terms to the state of Texas or bearer, with interest at five per cent semi-annually, and redeemable after the 31st of December, 1864.

In pursuance of an act of the legislature of Texas, the controller of public accounts of the state was authorized to

go to Washington and to receive there the bonds, the statute making it his duty to deposit them, when received, in the treasury of the state of Texas, to be disposed of as may be provided by law; and the statute further provided, that no bond, issued as aforesaid and payable to bearer, should be available in the hands of any holder until the same shall have been indorsed in the city of Austin by the governor of the state of Texas. Most of these bonds were indorsed and sold according to law, and paid, on presentation, by the United States prior to 1860. A part of them, however, which had been appropriated by act of the legislature as a school fund, were still in the treasury of Texas in January, 1861, when the late southern rebellion broke out.

On the 1st of February, 1861, the convention of the people of Texas adopted an ordinance to dissolve the union between the state of Texas and the other states, commonly called the ordinance of secession, whereby the legitimate government of the state was overthrown, and an insurrectionary government erected in its stead. And on the 11th of January, 1862, the legislature of the usurping government of the state of Texas passed an act repealing the act which made an indorsement of the bonds by the governor of Texas necessary to make them available in the hands of the holder.

On the 12th of January, 1865, the military board which had been established by the insurrectionary government, agreed to sell White & Chiles one hundred and thirty-five of these bonds, then in the treasury of Texas, and seventy-six others, deposited with certain bankers in England, in payment for which White & Chiles were to deliver a large quantity of cotton cards and medicines. The former bonds were delivered to White & Chiles on the fifteenth of March following. None of them were indorsed by any governor of Texas. After the rebel forces were disbanded, and the insurrectionary government of the state was overthrown, a provisional government was established in 1865, under the proclamation of the president of the

United States, and the people proceeded to make a constitution, and reconstructed their state government. By an act of the legislature of 1866, the governor of Texas was authorized to take such steps as he might deem best for the interests of the state in the matter. In this condition of things a bill in equity was filed on behalf of the state of Texas against White & Chiles, and others, claiming to be *bona fide* holders of a portion of said bonds, praying an injunction against their asking or receiving payment from the United States ; and that the bonds might be delivered to the state of Texas.

It was insisted by the counsel for the defendants in that case, that the contract with White & Chiles, being for the purchase of cotton cards and medicines, was not a contract in aid of the rebellion, but for obtaining goods capable of a use entirely legitimate and innocent, and, therefore, that payment for these goods, by the transfer of any property of the state, was not unlawful. The court say, "We cannot adopt this view, without entering, at this time, upon the inquiry, whether any contract made by such a board can be sustained. We are obliged to say that the enlarged powers of the board appear to us to have been conferred in furtherance of its main purpose, of war against the United States, and that the contract under consideration, even if made in the execution of these enlarged powers, was still a contract in aid of the rebellion and, therefore, void, and we cannot shut our eyes to the evidence which proves that the act of repeal was intended to aid rebellion by facilitating the transfer of these bonds. It was supposed, doubtless, that negotiation of them would be less difficult if they bore upon their face no direct evidence of having come from the possession of any insurgent state government. We can give no effect, therefore, to this repealing act. It follows that the title of the state was not divested by the act of the insurgent government in entering into this contract." Texas v. White, 7 Wall. 700, 734.

The case at bar is very similar in many of its features and

attendant circumstances to that of Texas v. White. That was a contest between the state of Texas and her own citizens. This is a contest between the state of Mississippi and one of her railroad companies. Both suits were brought to recover school funds which had been placed in the respective treasuries of these states before the rebellion, and which had been appropriated by the insurrectionary governments of these states during the rebellion. The convention of the people of Texas of 1866 passed an ordinance looking to the recovery of these bonds. The convention of the people of Mississippi in 1865 refused to ratify and declare to be valid and binding, the act to enable the railroad companies of this state to pay the moneys borrowed by them, approved December 7, 1863. By an act of the legislature of Texas, in October, 1866, the governor of that state was authorized to take such steps as he might deem best for the interest of the state, either to recover the bonds or compromise with the holders. By an act of the legislature of the state of Mississippi, approved November 21, 1865, it was made the duty of the governor to look after these funds and to take such steps as may secure the payment of the moneys borrowed by the railroad companies in this state under an act approved March 7, 1856.

If the act of the legislature of Texas, of the 11th of January, 1862, repealing the act requiring the indorsement of the bonds by the governor to make them available, was, as decided in the case above referred to, in aid of the rebellion, by facilitating the transfer of those bonds, it may, with equal propriety, be said, that the act of the legislature of this state, of December the 7th, 1863, to enable said railroad companies to pay the moneys borrowed by them, in the treasury notes of the state, was in aid of the rebellion, by supplying an exhausted treasury with the means of prosecuting the war for the avowed purpose of subverting the government of the United States.

In the case of Thomas v. Taylor, 42 Miss. 710, the high court of errors and appeals of this state has decided that

these treasury notes, being issued in aid of the late civil war, are illegal and void. Upon the whole, we have arrived at the conclusion that the treasurer of the state had no authority to receive either Confederate or state treasury notes from the appellants, in payment of the money borrowed by them as set forth in the appellee's bill of complaint.

The decree is therefore affirmed, and the cause remanded, with leave to the appellants to answer the appellee's bill of complaint, within sixty days from this date.

SIMRALL, J. :

It is not proposed to argue the general subject (that has been done at length by the chief justice), but to state a single view of it, which impresses my mind most strongly. It is a principle of law, so often and in such various forms declared and applied by the federal judiciary, and our own, to wit: that all laws enacted by the several states, at war with the United States, in aid of it, to further its prosecution, are void and of no effect, that it is unnecessary to refer to the cases. The same principle is affirmed with more or less emphasis in the new constitutions of those states. So that the question for determination is one of intention, of purpose and effect. One of the modes, and not the least efficient of ascertaining the intention and purpose of a law, is to look at the state of affairs at the time of its enactment, and the effects that will be produced by it.

It must be assumed as a truth, which enforces itself upon the understanding, that there must have been some extraordinary motive that induced the legislature of 1863 to invite the railroad companies to pay into the treasury this large indebtedness (loaned in coin or its equivalent), in a currency then depreciated four, five or six hundred per centum below the coin standard. It was not called in for re-investment, for these companies held it upon ample security. The cheap funds in which the payment might be made, was a stimulant to the debtors to comply with the law; that

they should do so speedily.   They would be cut off from the opportunity altogether unless they complied within four months.   Contemporaneous history, as expressed in the public events of the times, and written in coeval legislation, furnish a conclusive explanation.   The territory of the state was then a part of the theater of the war; vast, hostile armies were upon or within her frontiers, and the legislature were putting into requisition every energy and resource to meet the crisis.   A considerable force of state troops had been put in the field.   There was a necessity for large sums of money to meet necessary and pressing expenditures.   In looking over the legislation of 1863, a short time before and after the passage of the law under consideration, it will be seen that it was chiefly directed to measures of military defense, to maintain troops in the field, and the families of soldiers at home.

On the 9th of December, 1863, an act was passed appropriating $2,400,000 for the support of troops, outfit, etc., for the ensuing fiscal year.   On the same day $25,000 was voted to aid in equipping a cavalry regiment.   On the same day $100,000 were placed at the disposal of the governor for the purchase of cotton and woolen cards for the families (primarily) of soldiers.   On the third of the same month, payment was directed to be made out of the treasury for cavalry horses lost in the service.   On the fifth of the same month, the three per cent fund (also a trust fund) then in the treasury, or that might afterward come in, was placed subject to general warrants.

The space of six days embraces these acts of the legislature, and also the act to authorize the railroad companies to pay their indebtedness to the state.   Those extraordinary demands for, and appropriations of, money, could not be met by the income from taxes; besides these, were the expenses of the civil establishments of the state.   Therefore, the indebtedness of the railroad companies to the state was called in.   Therefore, also, the three per cent fund was liberated from its trust character.   Money is an indispensable

sinew of war. I cannot resist the conviction that the act was passed for the purpose of raising means to wage war against the United States. The case is stronger, in its parts, than Texas v. White.